IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANICA ORULLIAN,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>HOUSING AUTHORITY OF SALT LAKE CITY,<br><br>　　　　　　Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:10-cv-276 CW |

　　　　In this action, Plaintiff Janica Orullian alleges that Defendant Housing Authority of Salt Lake City (the "Housing Authority") violated her due process rights. In support, Ms. Orullian contends that the Housing Authority wrongfully withheld permission for her to obtain new housing after she had been evicted from her previous apartment and denied her a hearing related to that permission.

　　　　This case was tried to the court on May 2, 2011. Ms. Orullian was represented by Timothy J. Williams. The Housing Authority was represented by James H. Deans. The Court heard the testimony of witnesses, received exhibits into evidence, and heard the arguments of counsel for the parties. The parties concluded their post-trial briefing in June 2011 and the Court heard closing arguments on August 15, 2011. Based on the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

　　　　The Court enters these findings of fact based on a preponderance of the evidence.

　　　　1.　　Ms. Orullian has been a participant in the Section 8 Housing Choice Voucher

Program for approximately five years.

2. Ms. Orullian is afflicted with mental and physical disabilities. Her primary source of income is her monthly Social Security disability payment.

3. The Housing Authority is a Public Housing Authority ("PHA"), and has administered Ms. Orullian's Section 8 Voucher for approximately the past five years.

4. During the relevant time period–September 2009 through January 2010–Kristin Barnhill was employed by the Housing Authority. Ms. Barnhill was Ms. Orullian's case worker.

5. In July 2009, Ms. Orullian entered into a Housing Assistance Payment Contract ("HAP Contract") with the owners of the South Willow Apartments and the Housing Authority.

6. Also in that time period, Ms. Orullian entered into a lease for and moved into apartment 207, at 6885 South Redwood Road, West Jordan, Utah, also known as the South Willow Apartment Complex.

7. In September 2009, South Willow Apartments served Ms. Orullian with a Three Day Notice to Vacate ( "Eviction Notice") alleging drug activity. Apparently, some of Ms. Orullian's neighbors had gotten ill from fumes alleged to have originated from Ms. Orullian's unit.

8. Unlike a Three Day Notice to Comply or Vacate, in which a tenant has the option of curing the alleged breach of the lease or vacating, the Eviction Notice did not provide Ms. Orullian the option of curing. Instead, Ms. Orullian was instructed to vacate her apartment within three calendar days or be subject to various potential liabilities.

9. South Willow Apartments filed an eviction action against Ms. Orullian with the Third District Court of Utah on October 7, 2009.

10. After being served with a copy of the complaint and notice of an Immediate Occupancy hearing set for October 13, 2009 to determine whether the landlord was entitled to possession of the apartment during the pendency of the eviction action, Ms. Orullian contacted Utah Legal Services.

11. Ms. Orullian's landlord hired a private company to test her apartment for methamphetamine contamination. Ms. Orullian was fully cooperative. The company reported that her unit was contaminated.

12. On or about October 24, 2009, the Salt Lake Valley Health Department put up a placard that prohibited Ms. Orullian from occupying her apartment. The same day the landlord, accompanied by police, required Ms. Orullian to vacate her apartment. At that time, Ms. Orullian was allowed a couple minutes to gather her medications and personal property she could carry out.

13. On October 30, 2009, South Willow Apartments notified the Housing Authority in writing of its eviction proceedings against Ms. Orullian. Prior to that time, however, Ms. Orullian had informed the Housing Authority of the proceedings verbally on various occasions.

14. During the months of October and November 2009, Ms. Orullian asked Ms. Barnhill of the Housing Authority for a moving packet/voucher so that she could move into a new apartment on several occasions. Utah Legal Services also contacted the Housing Authority on Ms. Orullian's behalf and requested a pre-termination notice and hearing.

15. In response to each request, Ms. Barnhill told Ms. Orullian that she could not have a moving packet/voucher and move into a new unit. Ms. Barnhill further did not provide Ms. Orullian with a pre-termination notice or an opportunity for a hearing. Ms. Barnhill told Ms.

Orullian that the Housing Authority was investigating Ms. Orullian for possible drug activity.

16. After being forced from her apartment, Ms. Orullian, with the financial assistance of family and friends, moved into a motel for approximately 10 days. At the end of that time, Ms. Orullian moved in with an acquaintance in exchange for rent.

17. During her time at the acquaintance's residence, Ms. Orullian was assaulted by the acquaintances' girlfriend.

18. Ms. Orullian subsequently moved into a friend's home where she slept on the couch in exchange for rent. Ms. Orullian also slept in her car during part of the time.

19. Ms. Orullian spent about $2,000 for the temporary housing, much of which she had to borrow or was paid on her behalf. As she moved from place to place, she lost a substantial portion of her personal property. She further suffered physical pain from an assault, and mental anguish and suffering related to her situation.

20. The Housing Authority did not conduct its own independent investigation of the reasons that Ms. Orullian's unit at South Willow Apartments was found to be contaminated with methamphetamine.

21. Ms. Barnhill testified that the Housing Authority would not have approved a new lease if Ms. Orullian had entered one, nor would it have entered a new HAP contract during the time period in which Ms. Orullian had been requesting a moving packet (October through November 2009).

22. On November 30, 2009, Salt Lake Valley Health Department sent a letter to the Housing Authority. The letter explained that it was not possible to determine whether the methamphetamine residue in Ms. Orullian's unit at South Willow Apartments had been there

weeks or years prior to the date of testing.

23. Based on that information, Ms. Barnhill arranged an appointment for December 2, 2009, to issue Ms. Orullian a moving packet/voucher so that Ms. Orullian could enter into a new lease and HAP Contract on a new apartment that would be subsidized by Housing Authority.

24. During the period of December 2, 2009 and December 18, 2009, Ms. Orullian searched for an apartment and landlord that would participate in the Section 8 Program. She found an apartment, completed the paperwork and submitted it to the Housing Authority.

25. On December 21, 2009, the Housing Authority performed its inspection of the new apartment Ms. Orullian wished to lease. The unit met the Housing Authority's requirements.

26. On or about December 24, 2009, Ms. Orullian moved into a new apartment, where she resided as of May 2011.

## CONCLUSIONS OF LAW

1. The Section 8 Housing Choice Voucher Program is a rental subsidy program enacted by Congress in 1983 and codified in 42 U.S.C. § 1437 (the "Program"). The Program subsidy is tethered to the participating family and the subsidy moves with the family over time. The family is permitted to rent from any private landlord who is willing to participate and has an available unit that passes the PHA's inspection and is within the established rent range.

2. Pursuant to the United States Housing Act, the purpose of the Federal housing subsidy program is designed to provide safe, sanitary, and decent housing to low income families.

3. Under the Program, the Housing Authority signs an Annual Contributions

Contract ("ACC") with the Untied States Department of HUD.

4. The ACC authorizes PHAs like the Defendant to enter into contracts with private landlords for housing assistance payments on behalf of the qualified low-income families such as Ms. Orullian.

5. Under Federal Regulations, a low income family, such as Ms. Orullian, has the right to continued participation so long as it meets the eligibility standards and otherwise complies with its legal obligations. The substance of these legal obligations is set forth in federal regulations promulgated by HUD. The regulations governing the Program provide for specific causes to terminate the assistance.

6. Benefits like those provided under the Housing Act are a matter of statutory entitlement for persons qualified to receive them. Accordingly, such individuals must receive due process before the benefits are terminated. *Goldberg v. Kelly*, 397 U.S. 254, 261-263 (1970).

7. A participant in the Section 8 program enjoys a property interest in continued occupancy of subsidized housing, so procedural due process applies before this interest is terminated. *Lowery v. District of Columbia Housing Auth.*, No. Civ.A. 04-1868(RMC), 2006 WL 666840 at *7 (D.D.C March 14, 2006).

8. Voucher holders who are confronted with adverse action by a PHA are statutorily entitled to specific grievance procedures. *See* 42 U.S.C. 1437d(k).

9. "The stated purpose of the Housing Act compels this Court to look beyond strict interpretation of the formal requirements of the regulations." *Brezina v. Dowdall*, 472 F. Supp. 82, 85 (N.D. Ill. 1979).

10. In *Goldberg*, Chief Justice Warren held that welfare recipients have a property

interest in continued receipt of benefits and that procedural due process requirements must be applied before a state agency can terminate those benefits.  *Goldberg*, 397 U.S. at 269-270.  Since that case, courts have continued to recognize that those same due process requirements apply equally in the context of subsidized housing benefits.  *See, e.g., Ferguson v. Metropolitan Dev. and Housing Agency*, 485 F. Supp. 517, 521 (M.D. Tenn. 1980) ("It is similarly undisputed that denial of benefits by local administrators of federal housing programs, like denial of other forms of public assistance, is a denial of an interest protected by the Fourteenth Amendment and therefore falls with the *Goldberg* analysis."); *Escalera v. New York Housing Auth.*, 425 F.2d 853, 861 (2nd Cir. 1970) ("The government cannot deprive a private citizen of his continued tenancy, without affording him adequate procedural safeguards even if public housing could be considered a privilege.") (citations omitted).

11. Participating families, like Ms. Orullian, have a property interest in their Section 8 voucher.  This includes, at its core, the right to rent a safe and sanitary unit that is subsidized in part by funding administered by the PHA.

12. 24 C.F.R. §982.314(b)(ii)(2) states: "A family may move to a new unit if: (2) *The owner has given the tenant a notice to vacate*, or has commenced an action to evict the tenant, or has obtained a court judgment or other process allowing the owner to evict the tenant." (Emphasis added).

13. 24 C.F.R. §982.314(e) states: "At any time, the PHA may deny permission to move in accordance with §982.552 (grounds for denial or termination of assistance)."

14. In turn, 24 C.F.R. §982.552, titled PHA denial or termination of assistance for family, states in paragraph (a)(3):

> Termination of assistance for a participant may include any or all of the following: refusing to enter into a HAP contract or approve a lease, terminating housing assistance payments under an outstanding HAP contract, *and refusing to process or provide assistance under portability procedures.*

(Emphasis added.)

15. Further, 24 C.F.R. §982.552(c), subtitled Authority to deny admission or termination of assistance, states:

> (1) Grounds for denial or termination of assistance. The PHA may at any time deny program assistance for an applicant, or terminate program assistance for a participant, for any of the following grounds: (I) If the family violates any family obligations under the program (see §982.551).

Moreover, 24 C.F.R. §982.553 requires that a participant be terminated from assistance for drug crime by family members.

16. 24 C.F.R. §982.555, titled Informal hearing for participant, states:

> (a) When hearing is required. (1) a PHA must give a participant family an opportunity for an informal hearing to consider whether the following PHA decisions relating to the individual circumstances of a participant family are in accordance with the law, HUD regulations and PHA policies: . . .
>
> (v) A determination to terminate assistance for a participant family because of the family's action or failure to act (see §982.552). . . .
>
> (2) In the cases described in paragraphs (a)(1) (iv), (v), and (vi) of this section, the PHA must give the opportunity for an informal hearing before the PHA terminates housing assistance payments for the family under an outstanding HAP contract. . . .
>
> (c)(2) In the cases described in paragraphs (a)(1) (iv), (v), and (vi) of this section, the PHA must give the family prompt written notice that the family may request a hearing. The notice must:
>
> (I) Contain a brief statement of reasons for the decision,
>
> (ii) State that if the family does not agree with the decision, the family may request an informal hearing on the decision, and

    (iii) State the deadline for the family to request an informal hearing.

    (d) Expeditious hearing process. Where a hearing for a participant family is required under this section, the PHA must proceed with the hearing in a reasonably expeditious manner upon the request of the family.

17.    Based on the above, if Ms. Orullian had been involved in drug use or manufacture in her unit in the South Willow Apartments, she would have been subject to termination of her assistance. There is no evidence, however, that leads the court to conclude that it was likely that Ms. Orullian was involved in any drug activity during her time in that unit.

18.    When Ms. Orullian received the initial eviction notice from the South Willow Apartments, she was entitled to move. Accordingly, the Housing Authority was required to follow the portability procedures of the Housing Act and its related regulations.

19.    The Housing Authority did not issue Ms. Orullian a moving packet/voucher or give Ms. Orullian a notice or a hearing. Rather, the Housing Authority waited for a third party to confirm whether there was any substance to the allegations that Ms. Orullian was involved in drug activity.

20.    The Court finds that the Housing Authority's refusal to issue a moving packet amounted to a termination of services. Without a moving packet/voucher, Ms. Orullian could not find a new apartment.

21.    Because her benefits were being terminated, Ms. Orullian was entitled to a notice that her benefits were being terminated and to an informal hearing. The Housing Authority provided neither of these to Ms. Orullian, despite numerous requests from her and on her behalf.

22.    It is undisputed that the Housing Authority continued to pay South Willow Apartments after it had initiated eviction proceedings against Ms. Orullian. The Housing

Authority argues that these payments establish that Ms. Orullian's benefits were not terminated. This argument is incorrect. The Housing Authority was on notice that Ms. Orullian had been given a notice to vacate, and that she had in fact vacated that unit. At that point, he Housing Authority was required to either provide Ms. Orullian with a moving packet or to provide her notice and an informal hearing to explain why such a packet would not be provided.

23. In denying Ms. Orullian's request to move and not providing her with the right to an informal hearing, the Housing Authority violated Ms. Orullian's right to due process and federal law as codified in 24 C.F.R. 982.555. *See*, *e.g.*, *Lowery*, 2006 WL 666840, ** 8-10.

24. The Housing Authority's adverse action resulted in both economic and non-economic damages to Ms. Orullian.

25. The Court finds that Ms. Orullian is entitled to economic damages in the amount of $2,500. In coming to this amount, the court factored in the amount of costs Ms. Orullian incurred in her temporary housing arrangements as well as an estimate of the value of the possessions Ms. Orullian lost as a result of her temporary homelessness. (Though Ms. Orullian did not provide the court with exact figures, the court finds that $2,500 is a reasonable amount based on the evidence at trial.) The court finds that these economic losses were directly caused by the failure of the Housing Authority to provide Ms. Orullian with due process because that denial resulted in her being essentially homeless during part of October, November, and most of December, 2009.

26. The court did not include damages related to the assault on Ms. Orullian in the above damages. While this incident was unfortunate, it was not caused by the Housing Authority's denial of due process, because Ms. Orullian's assailant was an intervening cause.

27. The court finds that non-economic damages are also appropriate in this case. The amount of such damages that court may award Ms. Orullian is limited to "damages arising from the denial of due process itself." *Gomes v. Wood*, 451 F.2d 1122, 1132 (10th Cir. 2006). The evidence supports a conclusion that the ordeal suffered by Ms. Orullian during her time without a home caused her significant amounts of emotional distress and anguish. Moreover, it was the Housing Authority's denial of due process that lead Ms. Orullian to the predicament she was in.

28. The court, however, finds that an amount of about $25,000, which Ms. Orullian requested, is excessive. Instead, the court awards Ms. Orullian $5,000 in non-economic damages.

29. Finally, the court concludes that Ms. Orullian is entitled to attorney's fees and costs.

SO ORDERED this 30th day of December, 2011.

BY THE COURT:

_____
Clark Waddoups
United States District Judge